## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 12 2016, 9:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Darlene R. Seymour
Ciyou & Dixon, PC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re: The Paternity of A.R. (Minor Child) | October 12, 2016 |
| A.R. (Minor Child) by Next Friend, C.T., III, | Court of Appeals Cause No. 41A04-1409-JP-436 |
| *Appellant-Petitioner,* | Appeal from the Johnson Superior Court |
| v. | The Honorable Terry K. Snow, Special Judge |
| J.R., | Cause No. 41D02-1312-JP-222 |
| *Appellee-Respondent.* | |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, Conrad Terhune (Father), appeals the trial court's Order, denying his petition to modify child custody of his minor daughter, A.R.T. (the Child).

We affirm.

## ISSUE

Father raises two issues on appeal, which we restate as: Whether the trial court abused its discretion by denying Father's petition to modify child custody.

## FACTS AND PROCEDURAL HISTORY

On January 8, 2008, Jessica Rees (Mother) gave birth to the Child. At the time the Child was born, paternity had not been established. Mother also has two daughters with two different fathers, A.R.D. born on September 13, 2000, and L.R.S., born on March 8, 2002. On April 3, 2008, Mother filed a petition to establish paternity. Father's paternity of the Child was conclusively established on July 8, 2008. On July 31, 2008, Father filed a motion for a custody evaluation referral, and the trial court referred the parties to Youth Connections in Johnson County on August 11, 2008. An Agreed Paternity was filed on November 19, 2008, in which the parties agreed to share joint legal custody of the Child, with Mother having primary physical custody. Parenting time was awarded to Father according to the Indiana Parenting Time Guidelines (Guidelines). In addition, the parties agreed that the Child's birth certificate would be amended to reflect Father's last name.

[5] Even with the existence of a mutual custody agreement, Mother consistently refused to allow Father to exercise regular overnight parenting time, and she would not adhere to the holiday parenting time schedule as ordered. In January of 2009, the parties submitted a Stipulation and Order Appointing Parenting Time Coordinator which was approved on January 29, 2009. With the help of a Parenting Coordinator (PC) from Youth Connections, the parties were to work on issues regarding parenting time. For the most part, Mother was very uncooperative. In a report dated September 29, 2009, the PC reported that a meeting had been scheduled for September 10, 2009, and adequate notices had been given to the parties; however, Mother failed to attend. In another report, the PC indicated that Mother had exhibited signs of being irrational in discussions, and the PC recommended counseling for Mother. The PC further stated that Mother had hung up on her phone calls several times, became verbally abusive when she was asked to follow the parenting time schedule, and at one time refused to leave the PC's office when she was asked to leave.

[6] On July 30, 2009, Father filed a petition for modification of child custody based on Mother's actions denying him parenting time. The parties participated in mediation, and on August 7, 2009, the trial court approved the parties' Mediated Agreement. This agreement specified, in part, that Father's weekend parenting time to commence Friday evening until Monday at noon on alternating weekends, and his mid-week parenting time to run from Wednesday evening until Thursday at noon.

[7]     Relevant to this appeal, on September 11, 2012, Father filed a second petition to modify custody. Father alleged, in part, that he had "grave concerns that . . . the [C]hild had been exposed to inappropriate behaviors" by members of Mother's household; and Mother was dating multiple men and her involvement with these men "confuses the [C]hild." (Appellant's App. p. 63). On March 8, 2013, Father requested a final hearing on the pending issues, and then on April 3, 2013, he requested the appointment of a *Guardian Ad Litem* (GAL). On April 15, 2013, the trial court appointed a GAL.

[8]     On April 27, 2013, the Child was at Father's home. Father resided with his teenage daughter, M.T., born from a previous relationship; his girlfriend, Shellie Hichert (Hichert); and Hichert's teenage children from a past relationship—daughter, M.S., and son, C.S. On that day, the GAL made an unannounced visit to Father's home and interviewed the Child as well as M.T. and M.S. Thereafter, on April 29, 2013, the GAL visited Mother's home to interview Mother. Mother subsequently filed a petition to remove the GAL. In her petition, Mother alleged that the GAL appeared intent on questioning her oldest daughter, A.R.D., about a report of unsubstantiated sexual abuse involving the Child. Specifically, there had been an allegation in February 2012 stating that A.R.D. had touched the Child's private area. The GAL responded by filing a motion to strike portions of Mother's petition. On July 22, 2013, four months after Mother's petition to remove the GAL, Mother filed a motion to withdraw and thereafter, the GAL visited Mother's home to interview the

Child, A.R.D., and Mother's other daughter, L.R.S. Mother closely monitored the interview, and according to the GAL, it seemed coached.

[9] On August 9, 2013, Mother wrote an email to the GAL inviting her to speak with the Child. According to Mother, the Child had something she wanted to share with the GAL. On Sunday, August 18, 2013, the GAL visited Mother's home unannounced. The GAL tried to talk to the Child while on a walk, but the Child walked very fast. Throughout the interview, the Child did not disclose anything to the GAL and appeared to have no idea why the GAL was meeting with her, and spent her time drawing. In October of 2013, the GAL asked Mother what the Child wanted to share, and Mother informed the GAL that the Child had alleged that Hichert, Father's live-in girlfriend, had hit her in anger and Father had called the Child a liar. The GAL also visited Father's home in that same month to interview the Child. The Child spoke minimally and spent most of the time drawing with markers.

[10] Although there had been unsubstantiated allegation of sexual abuse involving A.R.D. touching the Child's private area, Father remained concerned because the Child displayed inappropriate behavior. Specifically, in September of 2012, when Father picked up the Child from daycare, he found the Child with "another little boy in the bathroom and everyone was kind of checking each other out." (Tr. p. 98). More than a year after the sexual abuse allegation relating to A.R.D., in or about October of 2013, Mother made a report to DCS that Hichert's teenage son, C.S., touched the Child's private area. That allegation was later found to be unsubstantiated.

[11]    Father states that Mother had exposed the Child to numerous men. First, Father states that Michael Childers (Childers), Mother's current fiancé, has a criminal record—*i.e.*, a burglary conviction in 2008. In addition, Mother failed to disclose to the GAL her relationship with Childers or that he was living in her home. Mother's relationship with Childers had been on and off since 2008. Somewhere between 2008 and 2012, Mother became romantically involved with Gregg Smith (Smith), and there was a claim that Mother dated another man, Josh Hosman (Hosman), but the record shows that Hosman was Mother's friend.

[12]    On November 12, 2013, the GAL filed her twenty-nine-page report with the trial court. A bifurcated evidentiary hearing for Father's petition to modify the existing custody arrangement was held on March 11, 2014, and April 14, 2014. At the hearing, Mother, GAL, Mother's father, Father, and Hichert, testified. The GAL advised for the modification of custody based on her findings, and further opined that Father was a better parent. Mother indicated that she wished to maintain the status quo. At the close of the hearing, the trial court concluded that there was no substantial change in the circumstances to warrant modification of custody.

[13]    Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[14] Father argues that the trial court abused its discretion in refusing to modify custody. The trial court entered a number of orders at the conclusion of the hearing. These orders do not contain any purported conclusions of law, except for a single order denying modification of custody. Six other directives related to the parties' parenting time, the Child's insurance, the parties' obligation to disclose who resided in their homes, and the parties' obligation to report in the event of a relocation.

[15] We note that *sua sponte* findings control only the issues they cover, and a general judgment standard of review will control as to the issues upon which there are no findings. *In re Trust Created Under Last Will & Testament of Mitchell*, 788 N.E.2d 433, 435 (Ind. Ct. App. 2003). "A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." *Id.* In reviewing a judgment, we will neither reweigh the evidence nor judge the credibility of the witnesses. *Id*

[16] We grant latitude and deference to trial courts in family matters. *Heagy v. Kean*, 864 N.E.2d 383, 388 (Ind. Ct. App. 2007), *trans. denied*. "Therefore, custody modifications are left to the sound discretion of the trial court, and we may reverse only for an abuse of that discretion." *Id.* "[I]t is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal."

*Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley*, 247 Ind. 201, 210 N.E.2d 850 (1965)).

## II. *Modification of Custody*

[17]     As a preliminary matter, we note that Mother did not file an appellee's brief. When an appellee does not submit a brief, we do not undertake the burden of developing arguments for that party. *Thurman v. Thurman*, 777 N.E.2d 41, 42 (Ind. Ct. App. 2002). Instead, we apply a less stringent standard of review and may reverse if the appellant establishes *prima facie* error. *Id.* *Prima facie* error is "error at first sight, on first appearance, or on the face of it." *Van Wieren v. Van Wieren*, 858 N.E.2d 216, 221 (Ind. Ct. App. 2006).

[18]     In Indiana, following establishment of paternity, "[t]he [trial] court may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 2. . . ." Ind. Code § 31-14-13-6. Indiana Code section 31-14-13-2, in turn, sets forth the following factors:[1]

---

[1] Father cited to the statutory provisions for modification of custody in a dissolution action, Indiana Code section 31-17-2-21, rather than the statutory provisions for modification of custody in a paternity action, Indiana Code section 31-14-13-6. Although Father cites the incorrect article, his argument is unaffected as the legal standards included in Article 14 of Title 31 are, in pertinent part, identical to those in Article 17.

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a *[de facto]* custodian . . .

I.C. § 31-14-13-2.

[19] At the close of the evidentiary hearing, the trial court concluded that "[F]ather has failed to show sufficient evidence to make it unreasonable to continue the custody arrangement that the parties agreed to previously. And that there is nothing to show that it's not in the best interest[,] or that it would be in the best interest of the child to change it." (Tr. p. 74). We note that in the trial court's

order denying Father modification of custody, the trial court did not expressly indicate which of the above factors it considered when it determined that a change in custody would not be in the Child's best interest.

[20] Because Father filed the petition to modify child custody, he carries the burden of establishing circumstances so substantial and continuous as to make the terms of the original child custody determination unreasonable. Father first notes that there was a substantial change in the Child's mental and physical health based on the sexual abuse allegations. Although Father concedes that the sexual abuse claims against A.R.D. and C.S. were found to be unsubstantiated by DCS, Father claims that the Child endured trauma by undergoing DCS investigation. Father's argument fails, since the trial court appears to have deferred to the DCS's closure of the sexual abuse assertions against the Child with the designation that they had been unsubstantiated.[2]

_____

[2] Father also claims that Mother had anger problems, and he directs us to the PC's recommendations that Mother should have undergone counseling. We note that the PC's counseling recommendation was prompted in June 2009 when she noted Mother's erratic behavior on the times she interacted with Mother regarding parenting time, as well as Mother's inability to stay rational in those discussions. In his appellate brief, Father now posits that if Mother followed the counseling recommendation, she would be able to "rectify the emotional issues she has, facilitate her children's best interest, and perhaps even diffuse her anger towards Father." (Appellant's Br. p. 12). Although the PC 's recommendation was approved by the trial court, shortly thereafter, in August 2009, the parties entered into mediation and resolved "all other pending issues in the captioned case." (Appellant's App. p. 58).

Next, Father claims that Mother had exposed the Child to "a number of men with criminal backgrounds." (Appellant's Br. p. 13). We recognize that a trial court considers the child's relationship not only with his or her parents, but also with "any other person who may significantly affect the child's best interests." *See* I.C. § 31-17-2-8(4)(C). Looking at the record, we find no evidence to demonstrate that Mother had exposed the Child to *several* boyfriends. The only evidence in the record indicates that Mother had two boyfriends. Mother began dating Childers in 2008, and her relationship with Childers was on and off. Mother dated Smith, and then resumed her relationship with Childers. At the time of the evidentiary hearing, Mother was engaged to Childers. Here, the record counters Father's claim that Mother dated numerous men, and despite Mother's choice of dating a man with a criminal history, no evidence was presented that Mother's relationship or cohabitation with Childers presented any adverse effect to the Child's well-being.

In addition, Father argues that his petition to modify custody should have been granted because Mother exhibited a desire to obtain retribution against him. Father posits that a change of custody would reduce the "antagonism" between him and Mother, and he cites, in this regard, *Needham v. Needham*, 408 N.E.2d 562, 564 (Ind. Ct. App. 1980), holding that the trial court could consider mother's antagonism toward father and mother's attempts to "poison" the father in the children's minds. In advancing his claim, Father directs us to Mother's report to the police disclosing Hichert's location which resulted in an arrest. The record shows that Father and Hichert run a concrete business

together, and there was an arrest warrant for Hichert for collection of money in relation to that business. In October of 2013, Mother informed the police that Hichert would be dropping off the Child to her at a certain location. The police detained Hichert at that location. According to Father, Mother was being vengeful. We find that Mother's actions, painted by Father as being vindictive, was an isolated event. This court has held that isolated acts of misconduct by a custodial parent do not mandate a custody modification. *In re Paternity of M.J.M.*, 766 N.E.2d 1203, 1209 (Ind. Ct. App. 2002).

[23] Not surprisingly, Father places much emphasis on the GAL's testimony that, in her opinion, it would be in the Child's best interest to be placed in Father's custody. That testimony, however, was merely one item of evidence for the trial court to consider in reviewing all of the pertinent factors for modifying custody. A trial court is not required to accept opinions of experts regarding custody. *Clark v. Madden*, 725 N.E.2d 100, 109 (Ind. Ct. App. 2000).

[24] Frequently, trial courts are required to make difficult decisions in custody disputes. Father has failed to demonstrate that the Child's mental health was in jeopardy based on the unsubstantiated sexual abuse allegation, that Mother's boyfriends negatively affected the Child, or that Mother's conduct of calling the police on Hichert was so egregious to warrant a custody modification. We find Father's arguments are essentially an invitation to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. *In re Trust Created Under Last Will & Testament of Mitchell*, 788 N.E.2d at 435. Based on all of the evidence before us we cannot say that the trial court abused its discretion by

finding that no substantial change occurred in one of the statutory factors or that modification was not in Child's best interests. Accordingly, we conclude that the trial court did not abuse its discretion by denying Father's petition for modification of custody.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion by denying Father's petition to modify custody.

Affirmed.

Barnes, J. concurs

Bailey, J. concurs in result